## STATE v. FRITZ GARDIN.

86 N. W. (2d) 711.

December 6, 1957—No. 37,221.

*Hvass, Weisman, Peterson, King & Schwappach,* for appellant.

*Charles A. Sawyer,* City Attorney, and *Milton Gershin,* Assistant City Attorney, for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the municipal court of Minneapolis denying defendant's motion to set aside the court's finding of guilty and requesting that a finding of not guilty be made instead or, in the alternative, for a new trial.

On October 16, 1956, at approximately 5:28 p. m., while it was still light outside, Jimmy Hill, a 2-year-old child, was struck by a motor vehicle while crossing Thirty-seventh Avenue North, between Hum-

boldt and Girard Avenues, in the city of Minneapolis. The automobile involved was being driven in an easterly direction on Thirty-seventh Avenue, and the motorist failed to stop after the accident. A witness for the city, Alger R. Ulstrom, aged 59 years, observed the automobile before the accident as it approached him while he was walking along the sidewalk in the block where the accident occurred. He did not see the impact between the boy and the car but heard the "thud" after the vehicle had passed. He then turned around and saw the car about 50 feet back of him, moving quite slowly away without stopping, although he claims that he yelled "stop" to the driver. He identified the car as being a Chevrolet; thought that it was dark green in color; and said that it had a trunk that "humped out" in the back. He obtained a license number from the automobile, which he read to be "MI 6605" Minnesota plates for the year 1956. A subsequent check of the records in the automobile division of the office of the secretary of state disclosed that there were no "MI" listings. A further examination of the "M" series, with the second letter being formed by a straight line and followed by the numeral 6605, revealed that there was only one license number like that in Minneapolis and that registration was MH 6605, which plates had been issued to defendant, Fritz Gardin, 4123 James Avenue North, Minneapolis. The record also discloses that defendant's car is a Chevrolet with a trunk that "humped out" in the back. Jo Ann Hill, the boy's mother, also at the scene of the accident, said that the car was a dark green; she did not obtain the license number or the make of car. Herbert G. Shoemaker of the police department, who was called to the place where the accident occurred after it happened, testified, among other things, that at that time Ulstrom, who gave the license number of the car, told him that he thought the color of the car was dark green. Shoemaker said that he visited defendant's home two days later at about 8:15 in the evening; that defendant lived approximately six blocks from the scene of the accident; that he examined the car in the garage at defendant's home by using a flashlight and headlights of the patrol car; that it was a 1950 four-door Chevrolet sedan with "a hump on the back"; that the color of the Gardin car was "a bluish color, bluish green"; and that the license plate on the vehicle was "MH 6605."

Defendant was charged with the violation of Minneapolis City Charter and Ordinances (Perm. ed.) 9:1-1801.1 and 9:1-1803, which respectively provide as follows:

1801.1. "The driver of any vehicle involved in an accident resulting in injury to or death of any person shall immediately stop the vehicle at the scene of the accident, or as close thereto, as possible, but shall then return to, and in every event shall remain at, the scene of the accident until he has fulfilled the requirements of this ordinance as to the giving of information. The stop shall be made without unnecessarily obstructing traffic."

1803. "The driver of any vehicle involved in an accident resulting in injury to or death of any person, or damage to any vehicle which is driven or attended by any person, shall stop and give his name, address, and the registration number of the vehicle he is driving, and shall upon request and if available, exhibit his driver's or chauffeur's license to the person struck or the driver or occupant of or person attending any vehicle collided with, and shall render reasonable assistance to any person injured in such accident."

Defendant denied the charge, but he was found guilty in municipal court without a jury.

The legal issues raised by defendant upon appeal are: (1) Was the finding of guilty sustained by a fair preponderance of the evidence? (2) Did the court abuse its discretion in refusing to examine the automobile of defendant, which automobile was conveniently located and was accessible to the court during the trial?

Defendant, employed as a patrolman and guardian at Crystal Lake Cemetery, testified that he lived about six blocks from the cemetery but that he never had occasion to drive by the place where the accident occurred. He said that he left the cemetery that evening at 5:45 and arrived at his home about ten minutes to six. He claimed that he was never involved in an accident and denied that his car struck the child. He testified that his car was a 1950 Chevrolet with 1956 license plate number MH 6605; that no one other than himself drove the car that day; that he had never changed its color since he bought it secondhand in 1954; and that its color was blue with no green in it. He said that he

did not hear of the accident until two days after it happened, when Officer Shoemaker called on him on the evening of October 18. He said that the officer called again that evening, at which time Alger R. Ulstrom was with him. He claimed that he had known Ulstrom about 35 years, but the latter indicated that he had known defendant by sight rather than by name for some time. Defendant said that Ulstrom told him in the presence of the officer at his home that evening: "You wasn't the driver of that car and somebody else must have been driving that car." When questioned as to when he had last washed his car, defendant said about a month before; that he thought that his son Roger had washed it about two weeks later but that no one had washed it since the accident.

Officer Shoemaker testified that the car was clean when he saw it and that it appeared to have been washed recently. He said that defendant told him that he could not remember when he had washed the car last.

Frances Gardin, defendant's wife, testified that her husband got home about 10 or 15 minutes to six that evening. She admitted, however, that she had told Officer Shoemaker that the family, including her husband, were eating at 5:30 that evening. There was some later conflict in her testimony as to the exact time of eating. She claimed that she heard Ulstrom tell her husband, "you wasn't the one that was driving that car."

Virginia Gardin, a daughter of defendant, testified that she got home from work about 25 minutes to six on the evening of October 16 and that her father had not yet come home. She said that, when Ulstrom came to their home with Officer Shoemaker on the evening of October 18, the former looked at her father and said: "You weren't the one driving the car. * * * It must have been somebody else driving your car." She described the color of her father's car as "Air Force or postman blue, blue gray."

Roger Gardin, a son of defendant, who was with the family for the evening meal on October 16 and who was present in court during the trial, did not testify. While there is nothing in the record to show why Roger was not called as a witness, the rule is that, when a party fails to call an available witness possessing peculiar knowledge of the facts

of a case, a presumption arises that, if the witness had been called, his testimony would have been unfavorable to such party. 7 Dunnell, Dig. (3 ed.) § 3444, and cases cited.

Ulstrom denied that he ever told defendant in the presence of his wife and daughter or otherwise that defendant was not the one driving the car or that it must have been someone else. He claimed that what he did say to defendant was: "I'm not sure. I can't be positive." Officer Shoemaker corroborated Ulstrom in this connection by testifying that the latter said that he was not certain that defendant was the driver. The officer also said that, when he asked defendant what he was doing at the time of the accident, "approximately 5:30 p. m.," the latter first said that "he had been patrolling the cemetery" and later said that "he was eating his supper at approximately 5:30."

It will serve no useful purpose to go into complete detail of all the evidence since it is obvious that there are many conflicts with reference to the exact time defendant arrived home that evening; the time when the evening meal was eaten by the family; the exact color of the car; and what Ulstrom said to defendant with reference to whether he was the driver of the car which struck the child. Those were all matters to be weighed by the trial court, which had the opportunity of observing all the witnesses and of determining their credibility.

■ The prosecution here involved the violation of a municipal ordinance. In such cases, unlike a violation of a state statute, proof of guilt beyond a reasonable doubt need not be established. State v. Ketterer, 248 Minn. 173, 79 N. W. (2d) 136; State v. End, 232 Minn. 266, 45 N. W. (2d) 378. Instead, the rule is that proof of guilt by a fair preponderance of the evidence will support the verdict of conviction. State v. Wilson, 244 Minn. 382, 69 N. W. (2d) 905.

This case was tried before a court whose findings are entitled to the same weight as the verdict of a jury. Such findings will not be set aside upon appeal unless there is no reasonable evidence tending to support them. Werner v. Miller, 248 Minn. 75, 78 N. W. (2d) 63; Gifford v. Vore, 245 Minn. 432, 72 N. W. (2d) 625. It is our opinion, under the record here, that the evidence did reasonably tend to support the trial court's findings.

Defendant cites as controlling State v. Wilson, 244 Minn. 382, 69

N. W. (2d) 905. We agree that there are some similarities in that case which would justify defendant in citing it here. The evidence which was most persuasive in our determination of that case, in addition to certain conflicts and weaknesses in the testimony of the prosecution's principal witness, a 12-year-old girl, was the testimony of at least three witnesses for the defense, who were apparently disinterested although employees of the company where defendant worked. One said that she saw defendant at the office of the company on the twenty-fourth floor of the First National Bank building in St. Paul shortly after four o'clock in the afternoon of the day in question; another said that he had seen and spoken to defendant in the company office in the late afternoon of that day; and a third remembered that he had seen defendant in the office late that afternoon as he had been waiting for defendant, who had been out of town, to come in that day and get some mail off of the desk of the witness. The testimony of the 12-year-old witness for the prosecution there was that the offense complained of occurred between 4:30 and 4:45 in the afternoon at about Forty-fourth Street in Minneapolis, when the witness was stopped by a man in a green convertible Buick as she was riding her bicycle in a southerly direction on East Lake Harriet Boulevard in that city. Defendant there testified that he left the company office sometime after four o'clock that afternoon, which was corroborated by the three defense witnesses referred to, and that, after picking up his car on Fifth Street in St. Paul, he drove to Minneapolis by an entirely different route from the one which would have brought him to the locality where the girl said that she was stopped. There was also testimony on the part of defendant and his wife that he picked her up near the telephone office in Minneapolis about 5:03 that afternoon and that they were out at Highland Park in St. Paul by 5:30 p. m. that day. A brother of defendant testified that he saw them in that locality at 5:30 p. m. on the same day. It is true that the three last-named witnesses in that case were interested witnesses, as were defendant, his wife, and his daughter here. However, with the positive testimony of the three employee witnesses in that case that they had seen defendant after four o'clock on the twenty-fourth floor of the First National Bank building in St. Paul, it seemed questionable, under the circumstances there, that he could

have left that office so late that afternoon, picked up his car, and reached Forty-fourth Street and East Lake Harriet Boulevard in Minneapolis at the time of the alleged offense. This, added to other discrepancies in the record, led us to the conclusion that the prosecution did not prove its case by a fair preponderance of the evidence. For the reasons above stated, we do not consider that case controlling here.

■ Defendant raises a legal issue as to whether the trial court abused its discretion in refusing to visually examine his automobile, which was conveniently accessible during the trial. He argues that the court could have better understood the testimony of all the witnesses and would have been in a better position to weigh its credibility if it had done so.

The rule is well settled in this state that the granting or denying of a request that the jury view the premises is within the discretion of the trial court. Carl Lindquist & Carlson, Inc. v. Johanson, 182 Minn. 529, 235 N. W. 267; see, 19 Dunnell, Dig. (3 ed.) § 9721. We said, however, in Claesgens v. Animal Rescue League, Inc. 173 Minn. 61, 216 N. W. 535, that, in a case tried by a court without a jury, it was not error for the trial judge to visit the involved premises in order that the testimony might better be understood. In this case, defendant asked the court to view the automobile involved, which was just across the street from the courthouse, on the theory that the court should have a personal view of appearance and color of the car. In denying the request, the court took the position that this would not be proper as it would be an attempt to have the court substitute its judgment for that of the witnesses who testified, whereas it considered it its duty to rely on the evidence as a whole. We think that the matter was entirely for the discretion of the trial court and that there was no abuse of discretion in refusing to view the car.

Affirmed.

MR. CHIEF JUSTICE DELL took no part in the consideration or decision of this case.